UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JASON LEOPOLD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-2651 (DLF) |
| | ) | |
| FEDERAL BUREAU OF INVESTIGATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

# Table of Contents

BACKGROUND ............................................................................................................. 1

LEGAL STANDARD..................................................................................................... 1

ARGUMENTS................................................................................................................. 3

   I.    The FBI's Search Was Adequate ........................................................................ 3

   II.   The FBI Properly Invoked FOIA Exemption 1 ................................................. 7

   III.   The Court Should Uphold the Government's Withholdings Relying on Exemption 3  14

   IV.   Records Were Compiled for Law Enforcement Purposes ............................................. 16

   V.   The Government Properly Withheld Material Under FOIA Exemptions 6 and 7(C)....... 18

   VI.   The FBI Properly Withheld Material Under FOIA Exemption 7(D) .......................... 28

   VII.   The Government Properly Withheld Material Under FOIA Exemption 7(E) ............. 37

   VIII.   The Government Has Produced All Reasonably Segregable, Non-Exempt Material. . 44

CONCLUSION................................................................................................................. 45

# TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

*ACLU v. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011) ................................................................................. 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................................. 2

*Armstrong v. Exec. Off. of President*,
  97 F.3d 575 (D.C. Cir. 1996) ............................................................................... 44

*Baker & Hostetler LLP v. Dep't of Com.*,
  473 F.3d 312 (D.C. Cir. 2006) ........................................................................... 3, 4

*Beck v. Dep't of Just.*,
  997 F.2d 1489 (D.C. Cir. 1993) ........................................................................... 19

*Billington v. Dep't of Just.*,
  301 F. Supp. 2d 15 (D.D.C. 2004) ....................................................................... 29

*CIA v. Sims*,
  471 U.S. 159 (1985) ............................................................................................ 15

*Davis v. Dep't of Just.*,
  968 F.2d 1276 (D.C. Cir. 1992) ........................................................................... 19

*Dep't of Just. v. Landano*,
  508 U.S. 165 (1993) ............................................................................................ 29

*Dep't of Just. v. Reps. Comm. for Freedom of Press*,
  489 U.S. 749 (1989) ............................................................................................ 19

*Dep't of Just. v. Tax Analysts*,
  492 U.S. 136 (1989) .............................................................................................. 2

*Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014) ............................................................................. 2

*CREW v. Dep't of Lab.*,
  478 F. Supp. 2d 77 (D.D.C. 2007) ......................................................................... 2

*Dep't of State v. Ray*,
  502 U.S. 164 (1991) .............................................................................................. 1

*Dep't of State v. Wash. Post Co.*,
    456 U.S. 595 (1982) ............................................................................................ 18

*DiBacco v. Army,*
    795 F.3d 178 (D.C. Cir. 2015) ........................................................................... 15

*Emuwa v. Dep't of Homeland Sec.*,
    113 F.4th 1009 (D.C. Cir. 2024) ........................................................................ 45

*Fischer v. Dep't of Just.*,
    596 F. Supp. 2d 34 (D.D.C. 2009) ..................................................................... 29

*Gov't Accountability Proj. v. Dep't of State*,
    699 F. Supp. 2d 97 (D.D.C. 2010) ..................................................................... 18

*Hayden v. Nat'l Sec. Agency*,
    608 F.2d 1381 (D.C. Cir. 1979) ........................................................................... 2

*Iturralde v. Comptroller of Currency*,
    315 F.3d 311 (D.C. Cir. 2003) ............................................................................. 3

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ........................................................................................... 17

*Jud. Watch, Inc. v. Dep't of Def.*,
    715 F.3d 937 (D.C. Cir. 2013) ............................................................................. 7

*Judicial Watch v. Rossotti*,
    285 F. Supp. 2d 17 (D.D.C. 2003) ................................................................. 3, 26

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ........................................................................ 2, 14

*Leopold v. Dep't of Just.*,
    94 F.4th 33 (D.C. Cir. 2024) .............................................................................. 45

*Lepelletier v. FDIC*,
    164 F.3d 37 (D.C. Cir. 1999) ............................................................................. 18

*Long v. ICE*,
    279 F. Supp. 3d 226 (D.D.C. 2017) ................................................................... 19

*Loving v. Dep't of Def.*,
    550 F.3d 32 (D.C. Cir. 2008) ............................................................................... 1

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009) ........................................................................ 37

*Mead Data Ctr., Inc. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) .......................................................................... 44

*Medina-Hincapie v. Dep't of State*,
    700 F.2d 737 (D.C. Cir. 1983) .......................................................................... 16

*Mil. Audit Proj. v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ............................................................................ 2

*Miller v. Dep't of Just.*,
    872 F. Supp. 2d 12 (D.D.C. 2012) .................................................................... 29

*Milner v. Dep't of the Navy*,
    562 U.S. 562 (2011) .......................................................................................... 17

*Milton v. Dep't of Just.*,
    783 F. Supp. 2d 55 (D.D.C. 2011) .................................................................... 18

*Mobley v. CIA*,
    806 F.3d 568 (D.C. Cir. 2015) ............................................................................ 3

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007) ........................................................................ 15

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) .......................................................................................... 19

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ......................................................................... 3, 4

*Parker v. Dep't of Just.*,
    934 F.2d 375 (D.C. Cir. 1991) ..................................................................... 29, 30

*Perry v. Block*,
    684 F.2d 121 (D.C. Cir. 1982) ............................................................................ 4

*Pratt v. Webster*,
    673 F.2d 408 (D.C. Cir. 1982) .......................................................................... 17

*Pub. Emps. For Env't Responsibility v. United States Section, Int'l Boundary & Water Comm'n*,
    740 F.3d 195 (D.C. Cir. 2014) .......................................................................... 17

*Roth v. Dep't of Just.*,
    642 F.3d 1161 (D.C. Cir. 2011) ................................................................. 19, 20, 29

*SafeCard Servs. Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) .......................................................................... 3, 4

*Scott v. Harris*,
    550 U.S. 372 (2007) ............................................................................................... 2

*Smith v. CIA*,
    246 F. Supp. 3d 117 (D.D.C. 2017) ..................................................................... 19

*Steinberg v. Dep't of Just.*,
    23 F.3d 548 (D.C. Cir. 1994) ................................................................................ 3

*Sussman v. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) .......................................................................... 44

*Tax Analysts v. IRS*,
    294 F.3d 71 (D.C. Cir. 2002) .............................................................................. 17

*Valencia-Lucena v. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999) .............................................................................. 3

*Weisberg v. Dep't of Just.*,
    627 F.2d 365 (D.C. Cir. 1980) .............................................................................. 2

*Weisberg v. Dep't of Just.*,
    745 F.2d 1476 (D.C. Cir. 1984) ............................................................................ 3

*Wildlife v. Border Patrol*,
    623 F. Supp. 2d 83 (D.D.C. 2009) ........................................................................ 2

Statutes

5 U.S.C. § 552 ........................................................................................... 18, 34, 35
5 U.S.C. § 552(a)(4)(B) ....................................................................................... 2
5 U.S.C. § 552(b) ................................................................................................ 44
5 U.S.C. § 552(b)(1) ...................................................................................... 7, 54
5 U.S.C. § 552(b)(3) ........................................................................................... 15
5 U.S.C. § 552(b)(6) ............................................................................... 18, 19, 22
5 U.S.C. § 552(b)(7) ........................................................................................... 16
5 U.S.C. § 552(b)(7)(C) ............................................................................... 19, 22
5 U.S.C. § 552(b)(7)(D) ............................................................................... 28, 34
5 U.S.C. § 552(b)(7)(E) ............................................................................... 37, 43
8 U.S.C. § 1202(f) ....................................................................................... 16, 19, 20
18 U.S.C. § 3521(b)(1)(G) .................................................................................. 54

28 U.S.C. § 533 ....................................................................................................... 17, 20
44 U.S.C. Chap. 33 ............................................................................................................. 2
50 U.S.C. § 3003(4) .................................................................................................. 16, 19
50 U.S.C. § 3024 .................................................................................................. 16, 18, 19
50 U.S.C. § 3024(i)(1) ................................................................................. 15, 18, 19, 54

Rules

Fed. R. Civ. P. 56(a) .......................................................................................................... 2
Federal Rule of Civil Procedure 56(b) .............................................................................. 1

Regulations

28 C.F.R. § 0.85 ....................................................................................... 17, 18, 20, 21

The Federal Bureau of Investigation ("FBI") and Department of Justice ("DOJ") (collectively, "Defendants") respectfully move for summary judgment in their favor under Federal Rule of Civil Procedure ("Rule") 56. As demonstrated below, in the accompanying Statement of Material Facts Not in Genuine Dispute ("SMF"), in the Declarations of Shannon R. Hammer and Susan C. Weetman, in the accompanying *Vaughn* index, and in the classified material lodged for *ex parte*, *in camera review*, there is no genuine issue of material fact as the government's response to Plaintiffs' request made under the Freedom of Information Act ("FOIA").

## BACKGROUND

Plaintiffs submitted a FOIA to the FBI on July 14, 2022, seeking "*investigative and non investigative* case files, 302s, cross reference files" concerning Ivana Trump. *See* Declaration of Shannon R. Hammer ("Hammer Decl.") ¶ 5. Plaintiffs also requested the FBI conduct an ECF, TEXT, CRS and ELSUR search for records and files on Ivana Trump. *Id.* Plaintiffs filed this suit on September 1, 2022. *Id.* ¶ 13; *see also* ECF No. 1. The FBI issued five interim responses to Plaintiffs from March 24, 2023, through November 22, 2024. *See* SMF ¶¶ 4, 10, 12, 15, 17. The FBI released 213 pages in full or in part, with information withheld subject to Exemptions 1, 3, 6, and 7, and withheld in full 148 documents. *Id.* Exhibit DD of the Hammer Declaration (the *Vaughn* Index) identifies the pages redacted in part or withheld in full.

## LEGAL STANDARD

FOIA was enacted "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). FOIA "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)). "The agency bears the burden of establishing that a claimed exemption applies[,]" *Citizens for Resp. & Ethics*

*in Wash. ("CREW") v. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014), and exemptions are "given a narrow compass." *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

To prevail on summary judgment, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980) (citation modified). A court "may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *CREW v. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Mil. Audit Proj. v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). An agency's justification for withholding records "is sufficient if it appears logical or plausible." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation modified). Review is *de novo*, 5 U.S.C. § 552(a)(4)(B), but a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review[,]" *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

**ARGUMENTS**

## I.    The FBI's Search Was Adequate

The FBI fulfilled its obligations to search for records responsive to Plaintiffs' FOIA request because its search was reasonably calculated to uncover responsive records. An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents. *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325-26 (D.C. Cir. 1999). A FOIA search is sufficient "if the agency makes a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 318 (D.C. Cir. 2006) (citation modified). This standard of reasonableness "depends, not surprisingly, on the facts of each case." *Weisberg v. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984); *see also Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015). A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see also Oglesby v. Dep't of Army*, 920 F.2d 57, 68 n.13 (D.C. Cir. 1990) (rejecting argument that search was inadequate because it did not uncover "documents that [plaintiff] claims must exist"); *Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured"). Indeed, "the question is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was adequate." *Steinberg v. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994); *see also Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (the adequacy of a search "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search").

The agency bears the burden of showing that its search was calculated to uncover relevant records and may establish the adequacy of its search by submitting reasonably detailed,

nonconclusory affidavits describing its efforts. *Baker & Hostetler*, 473 F.3d at 318. It is not obligated to "set forth with meticulous documentation the details of an epic search for the requested records." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). Rather, an agency's declaration must show "that the search method was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F. 2d at 68. Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents. *SafeCard Servs.*, 926 F.2d at 1200, 1201 ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."). Absent contrary evidence, agency affidavits are sufficient to demonstrate the agency's compliance with FOIA. *See Perry*, 684 F.2d at 127.

Here, as set forth in the accompanying Hammer Declaration, there can be no reasonable doubt that the FBI's search was reasonably calculated to uncover responsive documents. The FBI determined that a search of the Central Records System's ("CRS") automated indices was the most reasonable means for it to locate records potentially responsive to Plaintiffs' FOIA request. *See* Hammer Decl. ¶ 24. The CRS is an "extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI while fulfilling its mission and integrated functions as a law enforcement and intelligence agency, and in the fulfillment of its administrative and personnel functions." *Id.* ¶ 25. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI field offices, and FBI legal attaché offices worldwide. *Id.*

The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subjects. *Id.* ¶ 26. The categories of CRS file classification are broad and include types of criminal conduct and investigations conducted by the FBI, as well as

categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. *Id.* For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number consisting of three sequential components: (a) the CRS file classification number; (b) the abbreviation of the FBI office of origin opening the file; and (c) the assigned individual case file number for the particular subject matter. *Id.* Within each case file, pertinent documents of interest are "serialized," or assigned a number in the order which the document is added to the file, typically in chronological order.

The general indices to the CRS function as the key to locating records within the enormous amount of information contained in the CRS. *Id.* ¶ 27. FBI personnel index information in the CRS by individual, organization, or activity or event when information is deemed of sufficient significance to warrant indexing for future retrieval. *Id.* The entries in the general indices fall into two categories, a main index entry and a reference index entry. *Id.* A main index entry is created for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation, and main subjects are identified in the case title of a file. *Id.* A reference index entry is created for an individual or non-individual (e.g., organization, event, or activity) associated with an investigation, but who or which is not the main subject or focus of the investigation. *Id.* Reference subjects are typically not identified in the case title of a file. *Id.*

FBI personnel access the general indices through Sentinel, the FBI's case management system as of July 1, 2012. *Id.* ¶ 28. Before Sentinel, the FBI relied on a case management system known as Automated Case Support ("ACS"). *Id.* On August 1, 2018, the FBI decommissioned ACS and its indexed data was migrated into Sentinel, where such indices are accessible and searchable via Sentinel's search function. *Id.* In addition to providing access to the information previously indexed into ACS, Sentinel is a means for FBI personnel to access the FBI's older

manual indices. *Id.* FBI personnel rely on Sentinel to locate records and documents to fulfill essential functions, like criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries; and security screenings, to include presidential protection. *Id.* ¶ 29. Sentinel's index search methodology and function allow FBI personnel to query the CRS for indexed subjects in case files. *Id.*

The identification of records indexed to the subject of a FOIA request does not automatically mean the indexed records are responsive to that request. *Id.* ¶ 30. Index searches using the search functions available in Sentinel are how potentially responsive records are located, but ultimately a FOIA analyst must review potentially responsive records against the specific parameters of individual requests. *Id.* Responsiveness determinations are made once the records are gathered, analyzed, and sorted by FOIA analysts who make informed scoping decisions to determine the total pool of records responsive to a request. *Id.*

The FBI determined that a search of the CRS automated indices, available within Sentinel per its search functions, represented the most reasonable means to locate records potentially responsive to Plaintiffs' FOIA request. These "general indices provide access to a comprehensive, agency-wide set of indexed data on a broad array of investigative and administrative subjects and consist of millions of searchable records that are updated daily with newly indexed information." *Id.* ¶ 31. Additionally, because the requested subject matter predates and/or overlaps the implementation of both Sentinel and ACS, a manual indices search was required. *Id.* The FBI built on its manual indices search by conducting an index search of both the ACS and Sentinel indices to ensure all relevant data indexed after the implementation of ACS and Sentinel was captured. *Id.*

Here, the FBI conducted a search for main and reference entries in the Sentinel, ACS, and Manual indices via Sentinel's search function. *Id.* ¶ 32. It searched the indices using the following

terms: "Ivana Trump," "Trump, Ivana," "Ivana Zelnickova," and "Zelnikova, Ivana," employing a search cut-off date of July 21, 2022, which is the date of the FBI's initial search for records. *Id.* The FBI located responsive main and reference records as a result of this search. *Id.* Plaintiffs have provided no information for the FBI to reasonably conclude that records responsive under the FOIA would reside outside the CRS. *Id.* ¶ 33. There is no indication from the CRS search efforts that responsive records would reside in any other FBI system or location. *Id.* The FBI has searched all locations and files reasonably likely to contain responsive records, and there is no basis to conclude that a search elsewhere would reasonably be expected to locate responsive records. *Id.*

## II.    **The FBI Properly Invoked FOIA Exemption 1**

Pursuant to Exemption 1, agencies may withhold records "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and that "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order 13526 governs the classification of government records. 75 Fed. Reg. 707 (Dec. 29, 2009). Section 1.1(a) of Executive Order 13526 provides that information may be originally classified only if: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage. Relevant here, information may be classified if it "pertains to" "intelligence activities . . . [,] sources or methods," *id*. § 1.4(c) or "foreign relations or foreign activities of the United States" *id*. § 1.4(d). Of note, "pertains is not a very demanding verb." *Jud. Watch, Inc. v. Dep't of Def.*, 715

F.3d 937, 941 (D.C. Cir. 2013) (citation modified). And "because courts lack the expertise necessary to second-guess agency opinions in the typical national security FOIA case, they must accord substantial weight to an agency's affidavit concerning the details of the classified status of disputed records." *ACLU v. Dep't of Def.,* 628 F.3d 612, 619 (D.C. Cir. 2011) (citation modified).

As a threshold matter, the FBI's declarant is an original classification authority and personally and independently "concluded that the information protected pursuant to Exemption 1 was properly classified, continues to warrant classification at the 'Secret' level, and is exempt from disclosure pursuant to E.O. 13526 § 3.3(b)(1) – 'intelligence sources and methods;' and E.O. 13526 § 3.3(b)(6) – 'foreign government information.'" Hammer Decl. ¶¶ 42, 43. Likewise, the documents are "owned by" and "under the control of the U.S. Government." *Id.* ¶ 42.

Executive Order 13526 §§ 3.3 provides that records more than 25 years old are exempt from the automatic declassification requirements of the Executive Order if it can be established that specific national security harms associated with release exist. *See id.* §§ 3.3(b)(1)-(9).

**<u>Executive Order 13526 § 3.3(b)(1): Intelligence Sources and Methods:</u>** Executive Order 13526 § 3.3(b)(1) allows agencies to keep classified information that would reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign government or international organization, or a nonhuman intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development. In reviewing the records 25 years or older (but not yet 50 years old), the FBI's declarant "endeavored to determine whether such a threat still exists allowing for [her] to keep classified certain information." Hammer Decl. ¶ 45. The declarant determined that the below subcategories of information located within the records 25 years or older still warrant classification at the "Secret" level. *Id.*

The FBI withheld classified information concerning detailed intelligence activity information gathered or compiled by the FBI on a specific individual or organization of national security interest. *Id.* ¶ 46. The disclosure of this information could reasonably be expected to cause serious damage to the national security as it would: (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the activity; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time. *Id.* This information, explained thoroughly below, is properly classified at the "Secret" level pursuant to Executive Order 13526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption 1. *Id.*

*File Numbers*: The FBI withheld classified file numbers assigned to specific intelligence activities, including channelization and dissemination instructions. *Id.* ¶ 47. The release of these numbers would lead to exposure of particular intelligence activities and methods. *Id.* As described above, individual file numbers are assigned by FBI Headquarters and field offices and contain a geographical prefix of the originating office and case number, which includes the numerical characterization of the type of investigation, followed by a chronological number assigned to a specific investigation or activity. *Id.* The disclosure of an intelligence file number in the aggregate will enable adversaries to attribute any information released from the records, the file number to that particular file. *Id.* ¶ 48. Through analysis of this information, in concert with other information, including publicly available information, adversaries could then identify the specific intelligence activity. *Id.* A partial mosaic of the activity begins to appear as more information is identified as being associated with the particular file number, leading to the exposure of current activities. *Id.*

Disclosure of the file number would allow adversaries of the United States, or anyone not privileged to this information, to patch bits of information together until the activity is determined.

*Id.* The identification of the intelligence activity, which continues to be a source of intelligence to this day, will severely limit its use. *Id.* Further, disclosure will inform adversaries of the possible range of the FBI's intelligence capabilities, as well as the intelligence it has gathered, or can collect, concerning them. *Id.* This knowledge would provide violators of U.S. national security laws with a means of avoiding of lawful regulations by potentially implementing countermeasures, making future operations more difficult and compromising intelligence operations. *Id.* Accordingly, release of these file numbers can lead to the exposure of an intelligence activity utilized by FBI and can reasonably be expected to cause serious damage to national security. *Id.*

*Character and Title of Cases*: The FBI withheld classified information concerning the character and/or titles of the cases for specific types of intelligence activities directed at specific targets of national security interest. *Id.* ¶ 49. Disclosure of the characterization and/or titles of these cases could reasonably be expected to cause serious damage to the national security of the United States, as it would (a) disclose particular intelligence or counterintelligence investigations; (b) disclose the nature, scope or thrust of these investigations; and (c) reveal the manner by which intelligence or counterintelligence information was acquired. *Id.*

*Targets of Foreign Counterintelligence Investigations*: FBI withheld classified information identifying targets of FBI foreign counterintelligence/espionage investigations. *Id.* ¶ 50. This information's disclosure could reasonably be expected to cause serious damage to the national security of the United States as it would: (a) reveal the actual intelligence activity used by the FBI to identify a specific target; (b) disclose the intelligence-gathering capabilities of the activity; and (c) provide a description of an intelligence source penetration of a specific target during a specific period of time. *Id.* ¶ 50. The information could permit hostile individuals and foreign governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence-gathering

methods and activities and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information, which would severely disrupt the FBI's intelligence-gathering capabilities. *Id.* ¶ 51.

*Acronyms*: The FBI withheld classified acronyms that identify specific intelligence methods utilized by the FBI in its intelligence activities. *Id.* ¶ 52. The disclosure of this information could reasonably be expected to cause serious damage to the national security as it could permit hostile analysts to ascertain the specific nature of the FBI's investigations. *Id.*

*Code Words*: The FBI withheld classified code words that have never been publicly revealed and which, if disclosed, would reveal a specific intelligence source and method of continuing value to the FBI in its ongoing investigations. *Id.* ¶ 53. Code words are unique and assigned solely to one particular intelligence subject. *Id.* Code words are used in lieu of the actual name, description, and information concerning a specific subject or initiative of national security interest. *Id.* The withheld code words are sensitive and synonymous with specific, unknown intelligence collection. *Id.* Public disclosure of a code word will allow a hostile analyst, or anyone ignorant of the code word, to patch bits and pieces of information together until the actual use of an intelligence source and method can be determined. *Id.* In addition, the disclosure of a code word will inform hostile intelligence of the possible range of the FBI's intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or can collect, concerning them. *Id.*

*Classified Human Intelligence Sources and Information Provided*: A classified human intelligence source is an individual who provided or is currently providing information pertaining to national security matters, and disclosure of this individual's identity and or the information they provided could reasonably be expected to result in damage, serious damage, or exceptionally grave damage to the FBI's intelligence and counterintelligence-gathering capabilities. *Id.* ¶ 54. The

information contained in these documents, which pertains to classified human intelligence sources, is specific and, if disclosed, could reasonably be expected to reveal the identities of the contributing sources. *Id.* ¶ 55. The FBI's declarant considers a number of factors when considering if such information should be/remain classified, including, most importantly, the damage to the national security from publicly identifying sources utilized in intelligence investigations, and the FBI's ability to protect and recruit such intelligence sources in the future. *Id.*

Disclosure of FBI intelligence sources' identities, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and potential intelligence sources to fear that their identities will be publicly revealed at some point, despite the FBI's express or implied assurances of confidentiality. *Id.* ¶ 56. Sources' identities' disclosure could jeopardize the emotional and physical well-being of a source or their family or associates, and/or subject them to public ridicule and ostracism. *Id.* Thus, the release of source-identifying information could reasonably be expected to cause damage, serious damage, or exceptionally grave damage to the national security by causing current intelligence sources to cease providing information and discourage potential intelligence sources from cooperating with FBI for fear their identities would be publicly revealed at some point. *Id.* ¶ 57. Such reticence among current/potential sources would endanger one of the most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's efforts to detect and apprehend individuals who seek to damage the national security through violation of the United States criminal and national security laws. *Id.*

The FBI also withheld "Detailed Human Intelligence Source Information," *i.e.*, classified information provided by human intelligence source(s). *Id.* ¶ 58(a). This information is specific in nature and reflects the specific vantage point of the source(s). *Id.* If disclosed, this information could identify the intelligence source(s) and potentially subject them to retaliation based on their

cooperation with the FBI. *Id.* Furthermore, it could dissuade current and future FBI human intelligence sources from continuing to cooperate with the FBI. *Id.*

The FBI also withheld "Human Intelligence Source Symbol Numbers, Code Names, and File Numbers," *i.e.*, classified information consisting of singular identifying numbers or code names for intelligence sources. *Id.* ¶ 58(b). Numerical designators such as source symbol numbers, file numbers, and code names serve as singular identifiers for intelligence sources who provide information concerning individuals or organizations determined to be of national security interest. *Id.* A singular identifier is used in lieu of the true identity of a source. *Id.* These identifiers are assigned to specific sources and are unique to, and solely used for, specific sources. *Id.* The numerical designators (file numbers and source symbol numbers) are assigned sequentially. *Id.* The disclosure of this information could permit a hostile analyst to correlate the documents and whatever information can be gleaned from the documents to specific sources. *Id.* By matching source identifiers, such as file numbers, source symbol numbers, and code names, with bits and pieces of other information, one can begin to discern the true identity of the intelligence sources. *Id.* Public identification of a source will limit the effectiveness of these sources, could subject sources to retaliation by those on whom they provided information, and could also have a significant chilling effect on the FBI's ability to recruit future sources. *Id.*

**Executive Order 13526 § 3.3(b)(6) - Foreign Government Information:** Executive Order 3526 §§ 3.3(b)(6) allows agencies to keep classified information older than 25 years if it would reveal information, including foreign government information, that would cause serious harm to relations between the United States and a foreign government, or to ongoing diplomatic activities of the United States. In reviewing the records 25 years or older (but not yet 50 years old), the FBI's declarant "endeavored to determine whether such a threat still exists allowing for [her]

to keep classified certain information." Hammer Decl. ¶ 61. The declarant determined that the disclosure of information concerning foreign relations or foreign activities of the United States could still, despite the passage of time, reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope, or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources. *Id.* These harms would rise to the level of being considered serious harms, as release would cause serious damage to national security, thus warranting continued classification at the "Secret" level. *Id.*

In sum, the disclosure of information the FBI redacted pursuant to Exemption (1) could reasonably be expected to result in serious damage to U.S. national security. The FBI has satisfied its burden to show that the records are properly classified under Executive Order 13526, and that they are, therefore, properly withheld under FOIA Exemption 1. The declaration describes the record and the FBI's reasons for withholding information pursuant to Exemption 1, as well as the reasonably foreseeable harm that would ensue if the withheld material were released. *See Larson*, 565 F.3d at 862. The FBI's explanations as to why the records are classified are both "logical" and "plausible," and uncontroverted by evidence in the record. *Id.* (internal quotation marks omitted).

**III.    The Court Should Uphold the Government's Withholdings Relying on Exemption 3**

FOIA Exemption 3 exempts records when they are "specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria from

withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph." 5 U.S.C. § 552(b)(3). Thus, the sole issue "is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Morley v. CIA,* 508 F.3d 1108, 1126 (D.C. Cir. 2007).

The FBI asserted Exemption 3 to protect information regarding intelligence sources and methods pursuant to the National Security Act of 1947, § 102A(i), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 (collectively, the "National Security Act"). The D.C. Circuit repeatedly has held that the National Security Act "is a valid Exemption 3 statute." *DiBacco v. Army,* 795 F.3d 178, 183 (D.C. Cir. 2015).

The National Security Act requires the Director of National Intelligence ("DNI") to protect "intelligence sources and methods" from "unauthorized disclosure," 50 U.S.C. § 3024(i)(1). The National Security Act was enacted before the enactment of the Open FOIA Act of 2009. Hammer Decl. ¶ 63. The National Security Act leaves no discretion to agencies about withholding information about intelligence sources and methods. *Id.* The protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. *See CIA v. Sims*, 471 U.S. 159 (1985).

To fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community for the classification of information under applicable laws, Executive Orders, and other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In implementing this authority, the DNI promulgated Intelligence Community Directive 700, providing that Intelligence Community elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure." The FBI is one of eighteen member agencies comprising the Intelligence Community, and as such must protect

intelligence sources and methods. 50 U.S.C. § 3003(4). *See also* Hammer Decl. ¶ 64. Given the plain Congressional mandate to protect the Intelligence Communities' sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs. *Id.* ¶ 65. Therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024 (i)(1).

The FBI consulted with the Department of State ("State") concerning certain pages. Hammer Decl. ¶ 127. State asserted Exemption 3 to withhold information pursuant to Section 222(f) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1202(f). Weetman Decl. ¶ 10. "The records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States." 8 U.S.C. § 1202(f). "Under section 222(f) the Secretary of State has no authority to disclose material to the public. In that sense the confidentiality mandate is absolute; *all* matters covered by the statute 'shall be considered confidential.'" *Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 741-42 (D.C. Cir. 1983). Section 222(f) applies to information a visa applicant supplies and to any "information revealing the thought-processes of those who rule on the application" and "the inner workings of the State Department." *Id.* at 744. The seven pages State withheld in full under Exemption 3 per Section 222(f) contained information, including translated material, provided by private persons related to Ivana Trump and pertains directly to issuance or refusal of a visa. Weetman Decl. ¶ 13.

## IV.  **Records Were Compiled for Law Enforcement Purposes**

To fall within Exemption 7, documents must first meet a threshold requirement: that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). The term "law

enforcement" refers to the act of enforcing the law, both civil and criminal. *See Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002). "Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law." *Pub. Emps. For Env't Responsibility v. United States Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014). The "ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security." *Milner v. Dep't of the Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring). The term "compiled" requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 155 (1989). The Court is to "apply a more deferential attitude toward the claims of 'law enforcement purpose' made by a criminal law enforcement agency" because "inadvertent disclosure of criminal investigations, information sources, or enforcement techniques might cause serious harm to the legitimate interests of law enforcement agencies." *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982).

Pursuant to 28 U.S.C. §§ 533, 534, and Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations and 28 C.F.R. § 0.85, the FBI is the primary federal government investigative agency with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Hammer Decl. ¶ 67. Under this investigative authority, the responsive records relevant to this matter were compiled in furtherance of the FBI's foreign counterintelligence investigation of Ivana Trump and in furtherance of its foreign counterintelligence, foreign corruption and criminal investigations of other third-party subjects of FBI investigative interest. *Id.* Considering these files and records were

compiled to document the FBI's investigation of potential crimes and possible threats to national security, the FBI determined they were compiled for law enforcement purposes. *Id.*

The information withheld by State under Exemption 7 is in documents created by State's Bureau of Diplomatic Security ("DS"). Weetman Decl. ¶ 15. DS officers are the security and law enforcement arm of State and have a broad scope of global responsibilities, with protection of people, information, and property as the top priority. *Id.* DS designs and maintains security programs for every diplomatic mission in the world, investigates passport and visa fraud, conducts personnel security investigations, and protects the Secretary of State and high-ranking foreign dignitaries and officials visiting the United States. *Id.* DS also trains foreign civilian law enforcement officers in disciplines designed to reduce the threat and repercussions of terrorism throughout the world. *Id.* It is clear these documents were compiled for law enforcement purposes.

## V.    The Government Properly Withheld Material Under FOIA Exemptions 6 and 7(C)

Exemption 6 permits withholding of "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" is broadly construed and includes "[g]overnment records on an individual which can be identified as applying to that individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) ("The Supreme Court has interpreted the phrase 'similar files' to include all information that applies to a particular individual."); *Gov't Accountability Proj. v. Dep't of State*, 699 F. Supp. 2d 97, 105-06 (D.D.C. 2010) (as email addresses can be identified as applying to particular persons, they are "similar files" per Exemption 6). Indeed, "information in the file need not be intimate for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Milton v. Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011).

Courts generally follow a two-step process when considering withholdings or redactions under Exemption 6. First, a court determines if the records are the type of personnel, medical, or similar files the exemption covers. *Long v. ICE*, 279 F. Supp. 3d 226, 243 (D.D.C. 2017). Second, if records are of the type covered by the exemption, a court determines whether their disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

Exemption 7(C) protects from disclosure records compiled for law enforcement purposes where disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The "standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files" under Exemption 6. *Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989). To determine if disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy, courts balance the privacy interest of the person referenced in the record against the public interest in disclosure. *See Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993). "The only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." *Davis v. Dep't of Just.*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (citation modified). Thus, not only targets of law enforcement investigations, but also witnesses, informants, and investigating agents have a substantial interest in ensuring that their relationship to the investigations remains secret. *Roth v. Dep't of Just.*, 642 F.3d 1161, 1174 (D.C. Cir. 2011). Once the court finds that "the privacy concerns addressed by exemption 7(C) are present," the requester must "establish a sufficient reason for the disclosure" to obtain the records. *Smith v. CIA*, 246 F. Supp. 3d 117, 128 (D.D.C. 2017) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004)).

19

The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). *See* Hammer Decl. ¶ 68 n.13. Recognizing the distinction in the balancing tests used for Exemptions 6 and 7(C), the FBI notes that the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. *Id.*; *see also Roth*, 642 F.3d at 1173 (focusing analysis on Exemption 7(C) over Exemption 6 "since it is the broader of the two").

In asserting Exemptions 6 and 7(C), the FBI scrutinized each piece of information to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information (including, but not limited to: dates of birth, places of birth, residence addresses, telephone numbers, marital status, height, social security numbers, occupation/employment information, and/or professional titles) appears in the documents at issue. Hammer Decl. ¶ 70 & n.14. The FBI balanced the individual's privacy interest against the public's interest in disclosure. *Id.* A public interest exists only when information about an individual, their name, or their identifying information would shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States, and its function to: protect the United States from terrorist attacks; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights. *Id.* In each instance where information was withheld, the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure. *Id.*

Considering that privacy concerns typically are obviated once an individual is deceased, the FBI takes several steps to ascertain the current life/death status of the individuals whose names are withheld. *Id.* ¶ 71. The FBI uses the birth date and/or the date of the investigation to determine whether an individual is living or deceased, to the extent either or both pieces of information are

discernable from the file. *Id.* The date of birth is used to apply the judicially recognized "100-year rule," *i.e.*, if a person was born more than 100 years ago, the FBI presumes that he is dead, and the name is released. *Id.* The FBI also uses institutional knowledge gained from prior FOIA requests or internal records to identify with sufficient certainty the life/death status of certain persons. *Id.* If FBI cannot determine the life/death status of a person using these methods, the person's name is withheld if the FBI finds that disclosure would constitute an unwarranted invasion of the person's privacy should he still be living, and no public interest would be served in releasing the name. *Id.* It is also the FBI's policy to release names of high-ranking FBI officials and individuals in public positions, as they have diminished privacy rights while acting in their official capacity. *Id.* This policy is applied to the individual's position at the time of the document. *Id.*

<u>Names and Identifying Information of FBI Special Agents and Professional Staff:</u> The FBI withheld names and identifying information of FBI Special Agents and professional staff. Hammer Decl. ¶ 72. These FBI Special Agents and professional staff conducted, supervised, and/or maintained the investigations and administrative activities related to various investigations reflected in the documents responsive to Plaintiffs' request, including conducting interviews where information concerning Ivana Trump is referenced. *Id.*

*FBI Special Agents*. Assignments of Special Agents to an investigation are not by choice. *Id.* ¶ 73. Publicity, adverse or otherwise, arising from a particular investigation may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work. *Id.* The privacy consideration is also applied to protect Special Agents from unnecessary, unofficial questioning as to the conduct of investigations. *Id.* Special Agents conduct official inquiries into criminal and national security violation cases, and release of a Special Agent's identity in connection with a particular investigation could trigger hostility toward them. *Id.*

During an investigation, a Special Agent may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. *Id.* Individuals targeted by such investigations, and/or those sympathetic to the targets, could seek to inflict violence on a Special Agent based on their participation in an investigation. *Id.* An individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. *Id.* These individuals may seek revenge on Special Agents involved in an investigation. *Id.* There is no public interest served by disclosing the Special Agents' identities because their identities would not significantly increase the public's understanding of the FBI's operations and activities. *Id.*

*FBI Professional Staff.* The FBI withheld the names and identifying information of FBI professional staff. *Id.* ¶ 74. These FBI professional staff were assigned to handle tasks related to the FBI's investigation of Ivana Trump and in FBI investigations of third-party individuals where Ivana Trump is referenced. *Id.* Like Special Agents, these FBI employees could be targeted for reprisal based on their involvement in specific investigations. *Id.* Further, these FBI professional staff were, and may yet be, in positions of access to information regarding official law enforcement investigations, and thus could become targets of harassing inquiries for unauthorized access to investigations. *Id.* Thus, these individuals maintain substantial privacy interests in not having their identities disclosed. *Id.* In contrast, no public interest would be served by disclosing the identities of these FBI professional staff because their identities would not significantly increase the public's understanding of FBI operations and activities. *Id.* After balancing the professional staff employees' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy. *Id.*

*FBI Employee Unique Employer Identification Number*. The FBI withheld the Unique Employee Identification Number ("UEID") of an FBI Professional Staff member involved in the classification review of the records. *Id.* ¶ 75. UEIDs are singular numbers assigned to employees and serve as a means of identification within the government. *Id.* This unique identifier could be used to identify the employee who reviewed this document, which could subject the employee to targeted attempts to obtain sensitive or classified information which he/she may have access to due to his/her FBI employment. *Id.* Further, adversaries could co-opt the information to impersonate the employee's identity in relation to agency business. *Id.* ¶ 75. As such, the FBI determined this employee maintains substantial privacy interest in not having his/her UEID disclosed. *Id.* There is no public interest in this piece of information because its disclosure would not significantly increase the public's understanding of FBI operations and activities. *Id.*

*United States Citizenship and Immigration Services.* The FBI consulted with U.S. Citizenship and Immigration Services ("USCIS") concerning certain pages. *Id.* ¶ 126. USCIS asserted Exemption 7(C) to withhold personally identifying information pertaining to federal agency employees assigned to law enforcement matters. *Id.* n.16. The release of these individuals' personally identifying information could reasonably be expected to constitute an unwarranted invasion of these employees' personal privacy. *Id.* The information withheld on these pages is names, contact information, and other personal information about these employees and would not shed light on how the government performs its mission to carry out and enforce immigration laws. *Id.* Disclosure of this information could unnecessarily subject these individuals to harassment or harm by those individuals who may disagree with the Department of Homeland Security's mission or activities. *Id.* There is no public interest in this information that outweighs the privacy interests of these individuals. *Id.*

<u>Names and Identifying Information of Third Parties Who Provided Information:</u> The FBI withheld the names and identifying information of third parties who were interviewed, and/or provided information by other means, to the FBI during its investigations of Ivana Trump and of third-party subjects. Hammer Decl. ¶ 77. The identifying information of, and information provided by, these third-party individuals appear within the FBI's files because these individuals willingly divulged information relevant to FBI investigative efforts. *Id.* These individuals were not of investigative interest to the FBI. *Id.* Plaintiffs have not provided a privacy waiver from the third parties authorizing release of their information, nor has Plaintiffs supplied proof of death; therefore, these individuals maintain substantial and legitimate privacy interests in not having their cooperation or connection to FBI law enforcement matters disclosed. *Id.*

The FBI is an investigative and intelligence agency, and disclosure of these individuals' names and/or identifying information in connection with FBI records carries an extremely negative connotation. *Id.* Disclosure of the identities of individuals who willingly provide information to the FBI could subject these individuals to harassment or embarrassment, undue public attention, and/or unwanted inquiries for information related to their assistance. *Id.* ¶ 78. They could also be targeted for retaliation by investigative subjects or by those who simply disparage cooperation with law enforcement. *Id.* Exposure of a third party's cooperation with law enforcement could also lead to legal or economic detriment, negative professional and social repercussions, possible physical harm, or even death. *Id.* Thus, the FBI has determined these individuals maintain substantial privacy interests in not having their identities disclosed. The FBI identified no public interest in the disclosure of this information because disclosure of these individual's names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI. *Id.* ¶ 79.

24

<u>Names and Identifying Information of Third Parties Merely Mentioned:</u> The FBI withheld the names and identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiffs' request. *Id.* ¶ 80. The FBI has information about these third parties in its files because they were tangentially mentioned in conjunction with FBI investigative efforts, not because the individuals were of investigative interest to the FBI. *Id.* These third parties maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with FBI law enforcement matters. *Id.* The FBI is an investigative and intelligence agency, and disclosure of these third parties' names and/or identifying information in connection with FBI records or FBI investigations carries an extremely negative connotation. *Id.* Disclosure of their identities would subject them to possible harassment or criticism and focus derogatory inferences and suspicion on them. *Id.* The FBI considered if there was any public interest that would override these privacy interests and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. *Id.*

USCIS also exerted Exemption 6 to withhold identifying information in certain records that relate to third party individuals who did not provide consent for release. *Id.* n.17. This withheld information is on immigration documents and therefore are "similar files." *Id.* There is a strong privacy interest in this material because the withheld information is names and personal information pertaining to individuals not subject of Plaintiffs' FOIA request. *Id.* There is no public interest in this information as it does not shed light on how the agency is performing its duties. *Id.*

<u>Names and Identifying Information of Third Parties of Investigative Interest</u>: The FBI withheld the names and identifying information of third parties who were of investigative interest to the FBI. *Id.* ¶ 81. Being identified as a subject of FBI investigative interest carries a strong

negative connotation and a stigma, whether these individuals committed criminal acts or not. *Id.* Release of their identities to the public could subject them to harassment or embarrassment, as well as undue public attention. *Id.* It could result in professional and social repercussions due to resulting negative stigmas. *Id.* The FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. *Id.* In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was no public interest here sufficient to override these individuals' substantial privacy interests. *Id.*

Names and Identifying Information of Non-FBI Federal Government Personnel: The FBI withheld the names and identifying information of personnel from non-FBI federal government agencies who provided information to or otherwise assisted the FBI in its investigation of various subjects, whose records contain references to Ivana Trump. *Id.* ¶ 82. The rationale for protecting the identities of other government employees is the same as the rationale for protecting the identities of FBI employees. *See supra* at 21-22; Hammer Decl. ¶ 82. Publicity, adverse or otherwise, concerning the assistance of other agency employees in FBI investigations or investigative activities would seriously impair their effectiveness in assisting or participating in future FBI investigations or investigative activities. Hammer Decl. ¶ 82. The privacy consideration also protects these individuals from unnecessary, unofficial questioning as to the investigation. *Id.*

A person targeted by law enforcement action can carry a grudge for years and can seek revenge on the personnel involved in the investigations or investigative activities at issue in these FBI records. *Id.* The publicity associated with the release of their names and identifying information could trigger hostility towards them by such persons. *Id.* Therefore, these employees maintain substantial privacy interests in not having their identities disclosed in this context. *Id.*

There is no public interest in disclosure of this information because the identities would not demonstrate how the FBI performed its statutory mission and would not significantly increase the public's understanding of the FBI's operations and activities. *Id.*

      <u>Names and Identifying Information of Foreign Law Enforcement Personnel</u>: The FBI withheld the names and identifying information of foreign law enforcement agency personnel. *Id.* ¶ 83. These employees were acting in their official capacities and aided the FBI in the law enforcement investigative activities reflected in the records at issue. *Id.* The rationale for protecting the identities of Special Agents discussed above applies equally to the names and identifying information of these foreign law enforcement employees. Hammer Decl. ¶ 83. Release of the identities of these law enforcement employees could subject them as individuals to unnecessary and unwelcome harassment that would invade their privacy and could cause them to be targeted for reprisal. *Id.* In contrast, disclosure of this information would serve no public interest because it would not shed light on the operations and activities of the FBI. *Id.*

      <u>Department of State</u>: State also relied on Exemptions 6 and 7(C) in withholding information. Weetman Decl. ¶¶ 16, 17. Under Exemption 6, State withheld the names and personal information of private individuals and the name and/or signature of State officials. *Id.* ¶ 16. Release of this information would foreseeably harm the referenced individuals' privacy interests by subjecting them to harassment or unsolicited attention and would shed no light on the operations and activities of the U.S. Government. *Id.* Ex. 1 at 2 (State's *Vaughn* Index). Each State employee whose name has been withheld occupied a position below the rank of Deputy Assistant Secretary, and working-level employees whose names appear in responsive documents could face harassment and unwanted attention if their identities were released. *Id.* at 3. Such release would harm the individual's privacy interests, including their privacy interest in conducting official duties free

from harassment and interfere with their ability to perform their duties. *Id.* Release of this information would constitute a clearly unwarranted invasion of the individual's personal privacy, and any minimal public interest in knowing the exact identity of the working-level employee does not outweigh the potential harm in disclosure. *Id.*

Under Exemptions 6 and 7(C), State withheld names, descriptors, and signatures of Diplomatic Security ("DS") special agents and the names and identifying information of third parties, including foreign nationals, involved in an investigation at the U.S. Embassy in Prague. *Id.* ¶ 17. DS officers are the security and law enforcement arm of State. *Id.* Ex. 1 at 2. Government employees involved in law enforcement by nature of their work possess protectable privacy interests in their identities. *Id.* State withheld the identifying information of DS special agents because release of this information could subject them to harassment or unsolicited attention and would shed no light on the operations and activities of the Agency. *Id.* State also withheld identifying information of the individuals who were interviewed as part of the investigation. *Id.* Release of this information could reasonably be expected to subject the individuals to embarrassment, harassment, or threats of reprisal if they are identified as having provided information during or, participated in, or potentially been the subject of a law enforcement investigation. *Id.* As a result, release of this information would constitute a clearly unwarranted invasion of personal privacy, and any minimal public interest in the exact identities of the special agents or the persons interviewed does not outweigh the potential harm in disclosure. *Id.*

## VI.    The FBI Properly Withheld Material Under FOIA Exemption 7(D)

Exemption 7(D) allows withholding "records or information compiled for law enforcement purposes" if releasing them "could reasonably be expected to disclose the identity of a confidential source" or "information furnished" by such source. 5 U.S.C. § 552(b)(7)(D). Exemption 7(D)

"afford[s] the most comprehensive protection of all FOIA's law enforcement exemptions." *Billington v. Dep't of Just.*, 301 F. Supp. 2d 15, 21 (D.D.C. 2004). Exemption 7(D) does not require balancing public and private interests. *See Roth*, 642 F.3d at 1184-85.

The exemption's protections also extend to the "information furnished by a confidential source" to law enforcement authorities during a criminal investigation. *Fischer v. Dep't of Just.*, 596 F. Supp. 2d 34, 48-49 (D.D.C. 2009); *see also Parker v. Dep't of Just.*, 934 F.2d 375, 380 (D.C. Cir. 1991) ("[O]nce the agency receives information from a 'confidential source' during the course of a legitimate criminal investigation . . . *all* such information obtained from the confidential source receives protection."). In determining applicability of the exemption, "the question is . . . whether the particular source spoke with an understanding that the communication would remain confidential." *Dep't of Just. v. Landano*, 508 U.S. 165, 172 (1993). Confidentiality exists when "the source furnished information with the understanding that the [agency] would not divulge the communication except to the extent the [agency] thought necessary for law enforcement purposes." *Miller v. Dep't of Just.*, 872 F. Supp. 2d 12, 26 (D.D.C. 2012). If production of criminal investigative records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by" such a source, that ends the matter, and the agency is entitled to withhold the records under Exemption 7(D). *Parker*, 934 F.2d at 380. Once an agency establishes the confidentiality of a source, the FOIA requester faces a heavy burden in overcoming the presumption that assurances were given in exchange for the information and must come forward with "absolutely solid evidence showing that the source in a law enforcement investigation has manifested complete disregard for confidentiality." *Id.* at 378 (citation modified).

Numerous confidential sources report to the FBI on a regular basis; they provide information under express assurances of confidentiality and are "informants" within the common

meaning of the term. Hammer Decl. ¶ 85. Other individuals are interviewed and/or provide information under implied assurances of confidentiality or circumstances from which assurances of confidentiality may be inferred. *Id.* In either situation, these sources are considered confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI. *Id.* Information provided by these sources is singular in nature, and if released, could reveal their identities. *Id.* Sources assisting, cooperating with, and providing information to the FBI must be free to do so without fear of reprisal. *Id.* Sources must be free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation will later be made public. *Id.* Sources providing information to the FBI should be secure in the knowledge that their assistance and identities will be held in confidence. *Id.*

Release of a source's identity would forever eliminate her as a future means of obtaining information. *Id.* ¶ 86. Additionally, when the identity of one source is revealed, that revelation has a chilling effect on other sources' activities and cooperation. *Id.* That undermines one of the FBI's most important means of collecting information and could severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws. *Id.*

Confidential Source Symbol Numbers: The FBI protected the permanent source symbol numbers given to FBI confidential human sources. Hammer Decl. ¶ 87. The FBI assigns permanent source symbol numbers in sequential order to confidential human sources who report information to the FBI on a regular basis under express assurances of confidentiality. *Id.* Here, the FBI did not refer to confidential sources by their true names, instead using individually assigned permanent source symbol numbers to protect their identities. *Id.* The FBI obtained information from these

confidential sources relevant to the investigations discussed within the records at issue. *Id.*

If the FBI disclosed the confidential source symbol numbers of these informants, their identities could be ascertained by persons knowledgeable of the FBI's investigations and the events and subjects involved because these singular numbers are assigned to specific individuals. *Id.* ¶ 88. Repeated release of their numbers, within the context of certain events or in association with certain singular information, could enable criminals and those familiar with these matters to pinpoint who could have been present at certain events or could have known information. *Id.*

Further, once sources' identities were discerned, the informants and their families could be subjected to embarrassment, humiliation, and/or physical or mental harm. *Id.* ¶ 89. Moreover, the disclosure of a confidential human source's identity would likely portray the FBI as unwilling to protect its confidential human sources from exposure and/or negligent in honoring its promises to keep their identities confidential. *Id.* This could dissuade confidential human sources with access to critical intelligence from cooperating with FBI. *Id.* It is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this confidence that informants can be persuaded to continue providing valuable assistance in the future. *Id.*

Confidential Source File Numbers: The FBI protected the confidential source file numbers of permanent confidential human sources. *Id.* ¶ 90. Confidential source file numbers are administrative tools that facilitate the retrieval and storage of information supplied by confidential human sources. *Id.* Like confidential source symbol numbers, these confidential source file numbers are assigned in sequential order to confidential human sources who report information to the FBI on a regular basis under express assurances of confidentiality. *Id.* They are unique to particular confidential informants. *Id.* The numbers typically are recorded in an investigative record when information given by a confidential human source is memorialized in the investigative

record but are also copied into the informant's assigned confidential source file number. *Id.*

Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources because it would reveal the connections of confidential informants to the information they provided. *Id.* ¶ 91. Repeated release of confidential source file numbers along with the information provided by confidential human sources would narrow the possibilities of the informants' true identities. *Id.* This is especially true because each confidential source file number is assigned to only one confidential human source. *Id.* The revelation of an individual confidential human source's identity would expose them and their family to potential retaliation by those on whom they provided information, those sympathetic to targets of the FBI's investigative efforts, or those suspicious or hostile to law enforcement. *Id.* Such retaliation could include defamation of the source's character among their peers/family; economic reprisal such as deprivation of employment/business opportunities; violent threats aimed at instilling fear and doubt; or even violence itself such as physical harm or murder. *Id.*

Globally, revealing an informant's identity could dissuade current or future confidential human sources from cooperating with the FBI, and from providing the FBI with critical, timely intelligence needed to prevent and/or investigate violations of federal laws. *Id.* ¶ 92. Being able to provide credible assurances of complete confidentiality, and uphold such assurances, enables the FBI to enlist and maintain the cooperation of such confidential human sources. *Id.*

Information Provided by Symbol Numbered Sources: The FBI asserted protected information provided by confidential sources assigned unique source symbol numbers. *Id.* ¶ 93. Symbol numbers are not assigned to all informants utilized by the FBI, but the mere assignment of one indicates an express assurance of confidentiality. *Id.* Source symbol numbers are only assigned to confidential human sources who have been developed, instructed, closely monitored

and, often, paid for their services. *Id.* The release of information provided by a symbol numbered source may appear innocuous when appearing in separate documents; however, those knowledgeable of the specifics of the information and those present at the time of the events described could link the information to the confidential human source, thereby identifying both the confidential human source and the nature and scope of the information the confidential human source provided (and possibly continues to provide) to the FBI. *Id.*

Symbol numbered confidential human sources often work their way into criminal organizations and into the confidences of subjects of FBI criminal investigations. *Id.* ¶ 94. They become privy to the latest information about the activities of investigative subjects and are often the recipients of sensitive, confidential disclosures by these subjects. *Id.* These confidential human sources report information to the FBI on a regular basis under strictly controlled and confidential circumstances pursuant to express assurances that the FBI will keep confidential their identities and the information they provide. *Id.* Given the sensitive and singular nature of the information provided by such confidential human sources, the FBI withheld information provided by symbol numbered confidential human sources pursuant to an express agreement of confidentiality. *Id.*

The release of the information provided by a symbol numbered confidential human source to the public, moreover, would result in the FBI's inability to use that confidential human source in the future. *Id.* ¶ 95. The disclosure of information provided by one symbol numbered confidential human source also has a chilling effect on the activities and cooperation of other confidential human sources. *Id.* It is only with the understanding of complete confidentiality that the aid of confidential human sources can be enlisted, and only through this confidence that these confidential human sources can be persuaded to continue providing valuable assistance in the future. *Id.* In the records at issue, the FBI expressly promised these symbol numbered confidential

human sources that their identities and information they provided would be protected. *Id.* ¶ 96.

    <u>Names, Identifying Information of, and Information Provided by Individuals under Implied</u> <u>Assurances of Confidentiality</u>: The FBI protected the names, identifying information of, and information provided by third parties under circumstances in which confidentiality can be inferred. *Id.* ¶ 97. These third parties provided information concerning the activities of subjects who were of investigative interest to the FBI. *Id.* The FBI considered 1) the singularity of the information provided and the likelihood these individuals could be identified through release of this information by those familiar with the events described; 2) the proximity of these sources to the investigative subjects and events they described; and 3) and the nature of the criminal acts they described. *Id.* Based on these factors, the FBI inferred these individuals provided this information to the FBI only because they believed their cooperation with the FBI, and the information they provided (outside of its investigative use), would remain confidential. *Id.*

    The FBI protected the identifying information of, and information provided by, individuals who conveyed critical information regarding potential national security related matters. *Id.* ¶ 98. These individuals had ready access to and/or knowledge about investigative targets and others involved in national security criminal activity. *Id.* Such access exposed them to potentially significant harms should their association and cooperation with the FBI be disclosed. *Id.* One reason they risked harm when cooperating is they were positioned to have ready access to and/or knowledge about investigative targets and others involved in foreign counterintelligence or other criminal matters of investigative interest to the FBI. *Id.* Such reprisal can take many forms, including defamation of the source's character among their peers/family and threats aimed at instilling fear and doubt. *Id.* Considering these criminals already displayed or were believed by the sources to have a propensity towards violence, these sources likely feared violent reprisal. *Id.*

Further, harm could result simply from the fact they cooperated with law enforcement. *Id.* Even amidst these potential harms, these third-party sources provided specific, detailed information that is singular in nature – *i.e.,* only a few individuals would be privy to such information. *Id.* It is reasonable to infer these third parties cooperated with the FBI only because they expected their identities and the information they provided would be held in confidence. *Id.* ¶ 99.

        <u>Names, Identifying Information of, and Information Provided by Sources under Express Assurances of Confidentiality</u>: The FBI protected the names, identifying information of, and information provided by third parties to the FBI under express grants of confidentiality. *Id.* ¶ 100. When processing the records at issue, the FBI found evidence that FBI investigators would have, by standard practice, expressly promised these individuals, who provided specific and detailed singular information, that their identities and the information would remain confidential. *Id.*

        Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from confidential human sources. *Id.* ¶ 101. Without these assurances, those with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements to lessen the severity of any backlashes; thus, the FBI must provide credible assurances of confidentiality to these individuals to obtain factual, relevant, and timely information. *Id.* Release of these sources' identities and/or any information they provided may lead to the revelation of their identities and would display unwillingness by the FBI to honor its assurances of confidentiality to current and future confidential human sources. *Id.* Releasing this information would have a lasting negative impact on the FBI's informant program as it would greatly hinder the FBI's ability to recruit and maintain confidential human sources willing to provide accurate and relevant information pertaining to criminal activities. *Id.*

        The FBI determined its investigators granted certain individuals express assurances of

confidentiality because it located positive indicators that they were official, established FBI informants. *Id.* ¶ 102. The FBI located sources given source file numbers and/or source symbol numbers. *Id.* Official FBI informants are given informant files to house the information they provide during their work as confidential informants. *Id.* Thus, the existence of a source file number can be seen as proof the individual was an official, established confidential source, and received an express grant of confidentiality. *Id.* Another indication of official informant status is the replacement of an individual's name with a symbol source number, a tool used by FBI investigators to hide the identities of its formally established, confidential informants within FBI records. *Id.* Thus, the use of a symbol source number is also a positive indication sources were officially established and supplied with express grants of confidentiality. *Id.*

Name, Identifying Information of, and Information Provided by Foreign Government Agencies pursuant to an Express Agreement of Confidentiality: The FBI withheld names and other identifying information of foreign government agencies under an express assurance of confidentiality. *Id.* ¶ 104. These foreign government agencies cooperated with the FBI and provided valuable information with the express understanding that their identities and any information which would tend to identify them would only be used for law enforcement purposes and not be released to the public. *Id.*

The FBI has many agreements with foreign governments under which national security and/or criminal law enforcement information is exchanged. *Id.* ¶ 105. The agreements specify the extent of confidentiality requested by the respective foreign authorities. *Id.* While one foreign law government agency might request confidentiality for its identity and not necessarily the information provided, another agency may request that its information be protected while it does not object to the disclosure of its relationship with the FBI. *Id.* The FBI has worked very closely

with foreign government agencies who have become partners with it in its criminal, counterterrorism and national security investigations. *Id.* Disclosure of the identity of these foreign government agencies and the information they provided would have a chilling effect on the FBI's future relationship with these foreign government agencies, as such disclosure could result in its refusal to cooperate with the FBI in future investigations. *Id.* ¶ 106. Further, disclosure of the identities of these foreign government agencies would have a chilling effect on the FBI's relationships with other cooperative foreign government agencies. *Id.*

**VII.**    **The Government Properly Withheld Material Under FOIA Exemption 7(E)**

Exemption 7(E) allows withholding "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). "[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.*

The FBI applied Exemption 7(E) to withhold non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement mission, and to non-public details about techniques and procedures that are otherwise known to the public. Hammer Decl. ¶ 109.

Sensitive Investigative File Numbers: The FBI protected sensitive investigative file numbers. *Id.* ¶ 110. The release of file numbering convention identifies the investigative interest or priority given to such matters. *Id.* The protected file numbers are not known to the public. *Id.* These file numbers contain three portions. *Id.* The first portions consist of FBI file classification numbers which indicate the types of investigative/intelligence gathering programs the files pertain to. *Id.* Many of the FBI's classification numbers are public, which makes disclosure of this information even more telling. *Id.* Release of known file classification numbers in the context of investigative records would reveal the types of investigations being pursued, and thus the types of investigative techniques and procedures available to FBI investigators, and/or non-public facets of the FBI's investigative strategies. *Id.* Additionally, releasing non-public file classification numbers would reveal critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing when such file classification numbers are present within these and other sensitive FBI investigative records. *Id.*

The investigative file numbers also contain two letter office of origin codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue. *Id.* ¶ 111. Revealing this information would often provide critical information about where and how the FBI detected particular criminal behaviors or national security threats and reveal key pieces about the FBI's non-public FBI investigations or intelligence/evidence gathering sources and methods. *Id.* Revealing this information could also risk disclosing unknown FBI investigations or

intelligence gathering initiatives, by revealing interests in varying areas of FBI investigative responsibility. *Id.* Releasing this information could also provide significant information about the FBI's failure to detect certain types of criminal behavior. *Id.*

The third portion of these investigative files consists of the numbers given to the unique investigative initiatives these files memorialize. *Id.* ¶ 112. Releasing these file numbers would provide criminals and foreign adversaries with a tracking mechanism by which to place particular files or investigations within the context of larger FBI investigative efforts. *Id.* Continued release of sensitive investigative file numbers would provide criminals with an idea of how FBI investigations may be interrelated and when, why, and how it pursued different investigative strategies. *Id.* This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how it responds to different investigative circumstances, what it knows and when/how it obtained the knowledge, and if there are knowledge gaps in its gathered intelligence. *Id.* Release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. *Id.* ¶ 113.

Collection and Analysis of Information: The FBI protected the methods the FBI uses to collect and analyze information it obtains for investigative purposes. *Id.* ¶ 114. The release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it. *Id.* The methods the FBI withheld here are still in use today. *Id.*

Disclosure of this information would enable subjects of FBI investigations to circumvent these or similar currently used techniques. *Id.* ¶ 115. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. *Id.* This would facilitate the

accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. *Id.* Release of this information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow them to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. *Id.*

Focus of Specific Investigations: The FBI protected the focuses of specific counterintelligence investigations not publicly disclosed. *Id.* ¶ 116. Revealing this information to investigative targets would alert them to the FBI's interest in their activities, allowing them to take active measures to conceal/destroy evidence or modify their behavior to avoid future investigative scrutiny. *Id.* Additionally, release of this information would provide foreign adversaries a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities. *Id.*

Release of this information also would reveal key information about FBI intelligence gathering capabilities. *Id.* ¶ 117. Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence it possessed at particular points in time, and possibly when and how such information was obtained. This could enable foreign adversaries to discover non-public details about FBI intelligence gathering methods and help them determine how to modify operations to deprive FBI of such critical intelligence.

Specific Law Enforcement Techniques Utilized to Conduct National Security Investigations: The FBI protected sensitive investigative techniques used to conduct national security investigations. *Id.* ¶ 119. Due to the nature of these techniques, they qualify for protection pursuant to FOIA Exemption 7(E) as they are non-public law enforcement techniques, the release

of which would enable criminals to circumvent the law; but they also qualify for protection pursuant to Exemptions 1 and/or 3 as they are also intelligence gathering sources and methods used in a national security context. *Id.* These investigative techniques are highly sensitive and releasing additional information about them or discussing them in greater detail would reveal their very nature, and when and how they are utilized by the FBI in criminal and national security investigations. *Id.* This would enable criminals and foreign adversaries targeted by these techniques to predict and circumvent their use by the FBI. *Id.*

Surveillance Techniques: The FBI withheld information concerning the targets and locations of surveillance operations conducted by the FBI in relation to third party subjects of investigative interest. *Id.* ¶ 120. The FBI utilized these surveillance techniques to obtain investigative intelligence relevant to the investigation of these third party subjects. *Id.* The law enforcement techniques used to conduct these surveillance operations are techniques currently utilized by the FBI in criminal and national security investigations today. *Id.*

It is publicly known the FBI and other law enforcement agencies engage in surveillance in investigations. *Id.* ¶ 121. However, disclosure of non-public details about who, when, how, and under what circumstances the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies. *Id.* This is especially true because the success of investigative surveillance hinges on investigators' abilities to remain undetected. *Id.* Revealing non-public details about the FBI's methodology for conducting surveillance could potentially jeopardize the FBI's ability to operate surveillance covertly, and risks circumvention of the law. *Id.*

<u>Coordination with Foreign Government Agencies</u>: The FBI withheld information concerning its coordination of investigative efforts with foreign government agencies because disclosure of this information would reveal non-public details about FBI techniques of coordination (or lack thereof) between specific foreign government agencies and the FBI in a particular matter. *Id.* ¶ 122. It would also disclose the types of information the FBI can obtain from specific foreign government agencies and the types of cases it chooses to coordinate with foreign government agencies. *Id.* Intelligence and investigative information disseminated as a result of the coordination with foreign government agencies can be utilized to set leads in furtherance of the FBI's investigative efforts. *Id.* Merely acknowledging the type or volume of information shared between the FBI and specific foreign government agency partners would reveal the FBI's capabilities and vulnerabilities when it comes to coordination and information sharing with certain foreign government agencies. *Id.* This would provide criminals and foreign adversaries details concerning the scope of collection and information gathering capabilities and strengths of the FBI and identify vulnerabilities or weaknesses of the FBI and/or the foreign government agencies to exploit in these investigative areas/efforts and circumvent the law. *Id.*

<u>Coordination with Another Government Agency</u>: The FBI withheld coordination with another government agency pertaining to information referenced in the records at issue. *Id.* ¶ 123. Revealing this information would reveal the FBI located information on the subject matter relevant to the investigative purview of the other government agency and reveal which types of investigative data the FBI deems relevant enough to refer to or collaborate with this other government agency for further investigation. *Id.* This would allow criminals to structure their behavior to avoid triggers that would initiate an investigative referral from the FBI to its partners, and investigative scrutiny by additional government agencies. *Id.* Additionally, release of this

information could reveal which agencies cover specific types of investigative or intelligence matters and repeated release of this type of information would enable criminals to predict and circumvent FBI investigative coordination with its government partners and circumvent the law enforcement purpose of these partnerships and information sharing techniques. *Id.*

Investigation Code Names: The FBI withheld non-public details about investigation code names used by the FBI and described in the records at issue. *Id.* ¶ 124. The FBI relies on code names as a technique to conduct investigations. *Id.* It is publicly known the FBI uses code names in investigations, but the details of these particular code names are not known. *Id.* In effective FBI investigations, it is key that the subjects of the investigation and the public are unaware of that investigation. *Id.* Publicizing details concerning unknown FBI code names within these investigations would harm the FBI's ability to carry out its law enforcement mission. *Id.* If the FBI disclosed these non-public code names, it could have devastating operational consequences as it would reveal a technique of continuing value to the FBI for sensitive investigations. *Id.* Public disclosure of a code name would allow a criminal, adversary, or other individual to patch bits of information together to assess how code names are used and tie investigative activities to particular investigations, jeopardizing future use of code names by the FBI in similar cases or under similar circumstances. *Id.* While disclosure of a case code name within the context of the investigation to which it refers may not seem harmful, this information could be pieced together with public code names to reveal investigative associations. *Id.* This could enable individuals to connect subjects and investigations, forming a matrix of information that would reveal the extent of investigative information the FBI has compiled, and the focus of its investigative efforts. *Id.* The disclosure of these details would hinder the FBI's use of a valuable investigative technique and risk circumvention of the law by individuals seeking to evade the FBI's investigative focus. *Id.*

Department of State: State also relied on Exemption 7(E) in withholding information exchanged with other law enforcement agencies, including information regarding the types of employees interviewed and the class classified. Weetman Decl. ¶ 21; *Id.* Ex. 1 at 2. State withheld this information because disclosure could reveal investigative techniques related to protection of the U.S. diplomatic mission abroad. Weetman Decl. ¶ 21. If made public, individuals could harness this information to identify and exploit security vulnerabilities at U.S. Government compounds, risking the safety of the U.S. Government employees. *Id.* Moreover, release of this information could allow individuals to interfere with ongoing and future investigations into issues at U.S. Government compounds and personnel. *Id.* Release of the nonpublic details of these techniques would nullify their effectiveness. *Id.* Individuals who possess such knowledge may be able to utilize this information to search for vulnerabilities, thus compromising the effectiveness of the investigatory techniques, and would risk circumvention of the law. *Id.*

**VIII.**    **The Government Has Produced All Reasonably Segregable, Non-Exempt Material.**

Under FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data Ctr., Inc. v. Dep't of Air Force,* 566 F.2d 242, 260 (D.C. Cir. 1977). To establish that proper segregation, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). An agency "must specifically and thoughtfully" consider whether

otherwise exempt information can be released without foreseeable harm to the interests protected by the particular exemption. *Leopold v. Dep't of Just.*, 94 F.4th 33, 37-38 (D.C. Cir. 2024). Nonetheless, an attestation "that 'no further segregation' [i]s possible without disclosing such [exempt] information" suffices to establish an agency's fulfillment of its duty to segregate non-exempt material and to establish foreseeable harm. *Emuwa v. Dep't of Homeland Sec.*, 113 F.4th 1009, 1017 (D.C. Cir. 2024) (citing 5 U.S.C. § 552(a)(8)(A)(ii)).

Here, the FBI determined that 186 pages could be released in part. Hammer Decl. ¶ 130. These pages comprise a mixture of material that could be segregated for release and material that was withheld, as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages. *Id.* The FBI found that 151 pages required withholding in their entirety because the information was either fully covered by one or more FOIA exemptions or any non-exempt information was so intertwined with exempt material that no information could be reasonably segregated for release. *Id.* ¶ 131. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content. *Id.* FBI also reviewed the withheld exempt information and determined in each instance that no additional information would be segregated and released without causing foreseeable harm to the FBI and the interests protected by the FOIA Exemption being asserted. *Id.* State also conducted a thorough line by line review of the information it received for consultation and determined that there was no further meaningful, non-exempt information that could be reasonably segregated and released without disclosing exempt material and causing reasonably foreseeable harm. Weetman Decl. ¶ 22, Ex. 1 at 2-3.

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment in their favor.

Dated: June 23, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____ */s/ Kaitlin K. Eckrote* _____
     KAITLIN K. ECKROTE
     D.C. Bar #1670899
     Assistant United States Attorney
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2485

*Attorneys for the United States of America*